## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MARVIN PIERCE,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | **CIVIL ACTION NO.:** _____ |
| **v.** | § | |
| | § | **JURY DEMANDED** |
| | § | |
| **LEIDOS INC.,** | § | |
| | § | |
| *Defendant*, | § | |

---

### PLAINTIFF'S ORIGINAL PETITION

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff Marvin Pierce (hereinafter "Plaintiff" or "Mr. Pierce") files this Original Petition complaining of and about Defendant, Leidos, Inc., (hereinafter "Defendant"), in his official and individual capacity, and for cause of action against them, would show the Court as follows:

### I.    NATURE OF THE CLAIMS

1.    This action is filed under 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. §2000e-Title VII of the Civil Rights Act of 1964, to seek relief and correct unlawful employment practices by Leidos including race discrimination, retaliation, and unlawful termination of employment.

2.    This complaint seeks to recover actual and compensatory damages, including lost wages and benefits in the past and future, in an amount within the jurisdictional limits of the Court. Plaintiff also seeks an award of damages for his mental anguish and pain and suffering he has

suffered, continues to suffer, and will suffer in the future. Lastly, Plaintiff seeks to recover punitive damages, attorneys' fees, pre-judgment and post-judgment interest, and costs of court.

## II.    PARTIES AND SERVICE

3.    Plaintiff, Marvin Pierce, is a citizen of the United States and the State of Texas and resides in Brazoria County, Texas. Plaintiff is a former employee of Defendant.

4.    Defendant, Leidos Inc., (hereinafter "Leidos" or "Defendant") is a corporation that has multiple locations throughout the state of Texas. Leidos is a defense, aviation, information technology and biomedical research company that provides scientific, engineering, systems integration, and technical services. Defendant transacts business and provides services in the State of Texas and may be served with process through its registered agent, CT Corp System, at 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

## III.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331 (2019) as this case presents Federal questions.

6.    This Court has general and personal jurisdiction over Defendant based on the fact that Defendant maintains sufficient minimum contacts with the State of Texas. For years, Defendant has conducted business and provided services in many cities throughout the state of Texas, and it continues to do so.

7.    Venue is proper in the Southern District of Texas, Houston Division pursuant to 28 U.S.C. § 1391(b)(3) and 28 U.S.C. § 1391(c)(2) because Defendant is a Corporation that conducts business and provides services within this district, and thus has sufficient minimum contacts with this district. Therefore, Defendant is deemed a resident of this district and is subject to personal jurisdiction within this district.

## IV.    CONDITIONS PRECEDENT

8.      On November 12, 2019, Plaintiff timely filed a Charge of Discrimination against the Defendant with the Houston Division of the Equal Employment Opportunity Commission, EEOC Charge No. 570-2019-02134. Plaintiff requested a right to sue from the EEOC and received it on July 6, 2020. Plaintiff files this complaint within 90 days of receiving the notice of right to sue. All conditions precedent to filing this lawsuit have been performed or have occurred.

## V.    FACTUAL BACKGROUND

9.      Plaintiff incorporates by reference all of the allegations set forth above.

10.     On November 7, 2011, Mr. Marvin Pierce, began his employment with Lockheed Martin (hereinafter "Leidos")[1] as a Field Service Engineer (FSE). For over seven years, Plaintiff encountered no performance issues with Defendant. Plaintiff routinely exceeded expectations and was entrusted with various tasks due to his extraordinary capabilities. Defendant relied heavily on Plaintiff to support the program on shortages in personnel and expansion into countries outside of the Plaintiff's assigned location. In addition, Plaintiff had received seven positive annual performance reviews for every year spent at Leidos including a SPOT award from the defendant for his work performance.

11.     Wanting to explore career advancement options, Plaintiff applied for the Regional Manager's Requisition on March 23, 2011. As a backup, he also applied for the Kuwait Field Service Engineer (FSE) requisition, where he was working as the Country Manager. Mr. Pierce was never contacted for an interview for the Regional Managers position, however, Plaintiff discovered that Stephen Andrews, a white male working under Plaintiff on the same program, with far less experience and educational qualifications, was interviewed and offered the Regional

---

[1] In August 2016, Lockheed Martin completed separation of its Information Systems & Global Solutions (IS&GS) business segment and merged it with a subsidiary of Leidos Holdings, Inc.

Manager's position. Plaintiff was later offered the non-managerial role as a Kuwait FSE, which he accepted.

12.     Less than two months into the position, Mr. Andrews had already received two complaints from Black employees, including plaintiff. While discussing the complaint with Senior HR Business Partner, Pam Johnstone, Mr. Pierce was asked why he had not applied for the role himself considering he was the most qualified person in CENTCOM. Plaintiff replied that he, in fact, had applied. Ms. Johnstone went on to tell Mr. Pierce that it could be very difficult to work under someone "less qualified than you" but that Leidos was treating the numerous infractions and complaints about Mr. Andrews as training opportunities to improve his performance.

13.     On December 22, 2011, Plaintiff was formally provided an email explanation as to why he was denied an opportunity for an interview for Regional Manager. Ms. Johnstone alleged that due to protests in June of that year, the Regional Manager requisition would be cancelled, and the position was listed under a new requisition and job title. Plaintiff found this reasoning very odd since he had never heard of such protests nor had he seen any posting of such requisitions. Nevertheless, Plaintiff took Ms. Johnstone's word and pursued other advancement opportunities as they became available. However, this was only the beginning of Leidos' pattern of disparate treatment against him.

14.     In an attempt to gain more clarity as to why he was truly passed over for the Regional Manager's position and hoping to address his previous complaints regarding Mr. Andrews, Plaintiff agreed to a teleconference with Program Manager, Scott Pisut. During this teleconference, Plaintiff expressed his confusion about the Ms. Johnstone's reasoning for not interviewing him for the Regional Manager's position. In addition, Plaintiff addressed accusations made by Mr. Andrews that he and Scott Pisut felt that plaintiff lacked leadership skills. Mr. Pisut

then informed Plaintiff that the reason that he was not interviewed was simply because Mr. Pierce was not qualified for the job. Plaintiff was very confused now for several reasons. Firstly, the individual who was interviewed and ultimately offered the position, Mr. Andrews, was in fact less qualified for the position than Mr. Pierce. Notwithstanding, Mr. Pisut took the position that education did not play a part in that decision and that Mr. Pierce should focus more on how to be a better teammate to his colleagues. Mr. Pierce found it strange that no added value was given to his application despite his B.S. in Business, AAS in Information Technology, vast and significantly more experience in the RF-ITV field than Mr. Andrews and his being a Commission Officer in the U.S. Army, and a U.S. Veteran of the Armed Forces. Additionally, despite his initial conversation with Ms. Johnstone, wherein Mr. Pierce was falsely told that the requisition was cancelled due to June protests; Mr. Pisut made no mention of protests during his explanation to Mr. Pierce.

15.     Plaintiff started noticing an increased number of incidents wherein he was provided with conflicting information in support of Leidos' blatant preferential treatment of white employees. Taking mental note of this disparate treatment, Mr. Pierce continued performing his job duties, hoping to eventually move his career forward through hard work alone – a feat which would prove futile.

16.     In 2013, Plaintiff was yet again passed over for advancement when at the request of the customer, AMIS MAJ Ryan Lenard, Mr. Andrews was removed as Regional Manager due to repeated incidents with subordinates, customers, and Military personnel. Following his removal, Leidos replaced Mr. Andrews with yet another white male, Carlos Zambrana. Not unlike Mr. Andrews, Mr. Zambrana came with problems of his own. Namely, Mr. Zambrana had a well-documented history of below average performance in his previous role as NORTHCOM Regional Manager. Notwithstanding Mr. Zambrana's poor performance, he was still chosen over Mr. Pierce

for the CENTCOM Regional Manager position despite Mr. Pierce's clearly higher qualifications. Eventually, Mr. Zambrana resigned from the Regional Manager position, and Leidos sought not to backfill the position in CENTCOM. Instead, the Global Operations Manager, Charles Soodavar, became the Regional Manager.

17.     In the first few years following Mr. Pierce's denial of the Regional Manager position, Mr. Pierce continued showing promise in his role, receiving numerous accommodations and awards from customers, Leidos, and from the U.S. federal government and military. In 2015, Defendant relied solely on the Plaintiff to re-establish the ITV footprint throughout the Iraq Area of Operations (AOR) previously removed in 2011 during the Iraq drawdown. Mr. Pierce overcome numerous obstacles in the process and primarily worked alone performing high quality work. Through his actions, Mr. Pierce began creating a reputation for himself throughout the country as a diligent, innovative employee that was noticed by USARCENT G4 personnel. Despite his growing list of accomplishments, Mr. Pierce received push back from newly appointed Global Operations Manager | Regional Manager, Charles Soodavar (white), who prohibited Mr. Pierce from including his accomplishments in his 2015 Performance Review. Mr. Pierce documented accomplishments from his 2015 tour in Iraq in his Performance Evaluation. However, Mr. Soodavar stated he would not pay him for those accomplishments since he was awarded SPOT and SRA awards. Mr. Pierce explained that he was not trying to gain any additional compensation from those accomplishments but only wanted to include them in his performance evaluation as a matter of record. Mr. Soodavar disagreed and insisted they be removed.

18.     Despite his supervisor role as CENTCOM Team Lead, Mr. Pierce noticed a lack of respect and an overall disregard for his title as Team Lead from white employees, including continuous undermining of his authority by Mr. Soodavar. Specifically, in 2017, Mr. Pierce

noticed increased combativeness from Mr. Soodavar who managed CENTCOM from a remote location in Germany. Despite numerous failed attempts at reaching a resolution with Mr. Soodavar, the behavior persisted. To resolve the matter, Pierce initiated a conversation with Mr. Soodavar, wherein Mr. Pierce expressed his concerns. Namely, Mr. Pierce informed Mr. Soodavar that his behavior was calling into question Mr. Pierce's credibility and was undermining his authority to hold FSE's accountable for their actions. Furthermore, Mr. Soodavar's complete disregard for Mr. Pierce's authority was setting the tone for direct reports who may get the impression that Mr. Soodavar's behavior was acceptable.

19.     Mr. Pierce received no response from Mr. Soodavar who remained combative with his attitude. For the sake of the team's dynamics and overall morale, Mr. Pierce then requested that Mr. Soodavar remove himself from the CENTCOM day to day operations and make Mr. Pierce the manager instead. In doing so, Mr. Pierce requested no additional compensation, and offered to keep his existing 11 ITV sites as a manager; however, Mr. Soodavar refused stating three times that he agreed with Mr. Pisut's statements that Mr. Pierce was "not qualified to be a manager." Only after Mr. Pierce asserted that he could not continue working in this environment did Mr. Soodavar then state that he would "take a step back" and allow Mr. Pierce to perform his job without interference.

20.     After this conversation, it was clear to Mr. Pierce that the attitude towards him as a Black male in a leadership position was extremely negative, so much so, that even some of his subordinates began interfering with his work. Namely, David Woronoff, a white male subordinate of Mr. Pierce, caught on to the pattern of undermining Mr. Pierce's authority. Rather than reporting directly to Mr. Pierce as instructed, Mr. Woronoff began mirroring Mr. Soodavar's behavior, going over Mr. Pierce's head to Charles Soodavar, a white male.

21.     In the months to come, Mr. Pierce's concerns regarding racial discrimination proved increasingly valid as he experienced additional instances of combativeness from his white counterparts. Beginning in the Spring of 2018, while Mr. Pierce was deployed to the Afghanistan AOR to provide back-up support due to shortage of personnel and to train incoming personnel, Mr. Pierce's relationship with Mr. Soodavar worsened.

22.     In late 2018, CENTOM's team was informed that service management tickets (SMT) were not being updated with the latest status. This prompted Mr. Pierce to again send out SMT guidance on at least three different occasions, however, Plaintiff was again singled out to ensure that all FSE tickets were updated. Further, despite updating his team on three different occasions with Mr. Soodavar's knowledge, Plaintiff continued receiving the brunt of the blame for FSE's failure to update their SMTs. Mr. Soodavar would continue to hold Mr. Pierce solely responsible for updating all the SMT's distributed to the customers but assigned no accountability to the individual FSEs, even after Plaintiff held refresher trainings to individual FSEs on a multitude of job responsibilities and provided Mr. Soodavar notification of the trainings.

23.     Plaintiff never received negative reviews for his work performance nor any complaints on code of conduct during his tenure with Leidos. On March 7, 2019, Plaintiff first received his annual performance review from Mr. Soodavar in document form which indicated that he 'Consistently Met Expectations'. In fact, on March 11, 2019, Plaintiff received a salary raise due to his positive performance. However, also on March 7, 2019, Mr. Soodavar discussed Plaintiff's performance review over the phone in which he completely contradicted the earlier documented performance review. Throughout the duration of the call, Mr. Soodavar ridiculed and harassed Plaintiff. During the call, Mr. Soodavar accused Mr. Pierce of disappearing asking, "Where is Marvin?" on each example provided, repeatedly claiming that he was nonexistent in

performing his duties throughout 2018. During one specific example of the FSE turn over with Robert Bell and Aisha Grissam in Kandahar, Mr. Soodavar accused Mr. Pierce of not completing the asset turnover, when in fact, Mr. Pierce notified Mr. Soodavar in writing of the status of assets in Kandahar. Mr. Soodavar had even acknowledged Mr. Pierce's email. Despite having never received any prior negative evaluations, Mr. Soodavar verbally attacked with accusations of reoccurring performance issues. In a failed attempt to arouse an emotional response from Mr. Pierce, Mr. Soodavar addressed Mr. Pierce in a completely unprofessional manner, bating Mr. Pierce by swearing, yelling, and admonishing him for "not responding to anything." As was common, Mr. Pierce refrained from exacerbating the situation, allowing Mr. Soodavar to respond before offering anything in response. Plaintiff didn't understand the hostility that Mr. Soodavar displayed on this phone call since his recent performance review had been very positive. Especially since he would receive a salary raise for his performance later that day. As the conversation drew to an end, Mr. Soodavar threatened that he had already spoken with Mr. Pisut and with HR to make to replace Mr. Pierce as Team Lead in CENTCOM. Understanding this type of change to be discriminatorily based, Mr. Pierce voiced his concerns stating that the content of the conversation warranted a complaint against Mr. Soodavar. Visibly angered by Mr. Pierce's mention of a complaint, Mr. Soodavar reluctantly provided Mr. Pierce with contact information for Mr. Pisut and for Senior HR Business Partner, Julie Arney to report his complaint.

24.     Several days later, on March 12, 2019, Plaintiff was contacted by Ms. Arney to discuss the verbal dispute during the performance review. While speaking with Ms. Arney, Plaintiff realized that Mr. Soodavar had already reported the incident in a clear attempt to get ahead of Mr. Pierce. Mr. Soodavar had clearly falsely accused Plaintiff of being the aggressor. Shocked by Mr. Soodavar's vindictive actions, Mr. Pierce provided Ms. Arney an accurate recount of events

addressing both the performance review and the discriminatory treatment he faced from Mr. Soodavar.

25.     Several weeks after the March 7, 2019 incident, on April 2, 2019, Mr. Pierce was again contacted by Mr. Soodavar to discuss Plaintiff's UAE expense report. However, the conversation took a swift turn when Mr. Soodavar began recounting information regarding Mr. Pierce's confidential interviews with Ms. Arney concerning the March 7, 2019 incident, revealing information Mr. Soodavar would not have known without speaking to Ms. Arney. Clearly offended by Plaintiff's complaint, Mr. Soodavar spoke very harshly to Plaintiff. Stunned by the lack of confidentiality within the HR department, and now fearful of retaliation by Mr. Soodavar, Plaintiff realized he would be alone in his efforts to fight the discrimination he faced.

26.     In late April 2019, in connection with his complaints to HR, Mr. Pierce was contacted by Sr. Workplace Relations Manager, Angela Marquez, on multiple occasions regarding workplace behavior and communications stemming from the March 7, 2019 phone call with Mr. Soodavar. Once again, Mr. Pierce went through the painstaking details of his March 7, 2019 interaction with Mr. Soodavar. In addition to providing his account of the phone call, he was also asked to answer three "sensitive" follow up questions regarding his interaction with the customer during a late February 2019 visit to Kuwait and was instructed not to divulge the line of questioning to anyone, Mr. Pierce made every effort to comply. As he hoped to move forward in his career, the retaliation which soon followed made that impossible.

27.     Several weeks after his March 2019 complaints, HR interviews, and communication with Workplace Relations investigators, Plaintiff noticed retaliatory behaviors from Mr. Soodavar. Namely, Mr. Soodavar routinely rejected Plaintiff's expense reports even after approval from an auditor, thus preventing Plaintiff from timely submitting his expense reports.

This was especially odd because Plaintiff was submitting his expense reports in the same manner as he did before when they were formerly approved. In fact, the auditor even told Plaintiff that his manager kept rejecting his reports. Due to these circumstances, Plaintiff spent $1,300.00 of his personal funds to cover charges on his corporate credit card to prevent cancellation since a credit card cancellation was grounds for termination, a fact Mr. Soodavar was aware of.

28.     On May 9, 2019, Plaintiff contacted Carlos Zambrana (White), in an attempt to enforce the policies in the FSE SOP and instructed him to submit his overdue maintenance reports as soon as possible. This was done via a group chat which included Mr. Soodavar. Mr. Soodavar completely undermined Plaintiff's authority by replying that there is no "special rush" to get the reports submitted. Plaintiff immediately called Mr. Soodavar to tell him that he had unjustly abdicated Mr. Zambrana from his duties. However, this incident would be later used against Plaintiff in a Performance Improvement Plan (PIP) he would receive blaming him for the untimely submissions of reports from FSEs.

29.     On May 16, 2019, Mr. Pierce was called in for a teleconference to discuss the outcome of the alleged workplace investigation of the March 7, 2019 events. During this teleconference with Mr. Pisut, Ms. Arney, and Mr. Soodavar, Mr. Pierce was told that upon closing the investigation, the legal department had approved termination of Mr. Pierce, and as such, he could accept termination or instead be placed on a Performance Improvement Plan (PIP). Shocked by the blatantly retaliatory outcome of the alleged investigation, Mr. Pierce sought an additional explanation of the results; however, he was simply provided with a final written warning, and a copy of the PIP with each requiring a signature from the Plaintiff. After hearing the results of the alleged investigation, Mr. Pierce understood that the retaliation and discrimination he faced with Leidos would continue unchecked. Absent any previous negative reviews, Mr. Pierce did not

understand how Leidos contrived its list of performance issues when just prior to his performance evaluation, on March 7, 2019, the Government PEO EIS LNO awarded Mr. Pierce for performance excellence at the end of February 2019. It was increasingly clear that Leidos intended to prepare itself for Mr. Pierce's termination by providing pretextual reasons for doing so at a later date.

30.     Both the final written warning and the PIP contained information which was shockingly false. Upon reviewing both documents, it remained clear that Mr. Soodavar had every intention of falsely portraying Mr. Pierce as an angry, overly aggressive Black man, incapable of accepting criticism. In the March 7, 2019 incident with Mr. Soodavar, Plaintiff was made to look like the aggressor stating that he was "disrespectful" and "unprofessional." The final written warning also falsely stated that Plaintiff routinely had unprofessional outbursts wherein he used offensive language with employees and customers alike. This was especially alarming considering the fact that Mr. Soodavar had several verbal altercations with white employees, such as Carl Crowell, Gerard Villalobos, and Gilbert Green where no adverse action was taken against them even though they openly disrespected Mr. Soodavar, using expletives and yelling. No warnings were ever given. The PIP accused Plaintiff of poor leadership which directly conflicted with Plaintiff's last year's Annual Performance Review, wherein Mr. Perce received ratings stating that he consistently met expectations. Plaintiff submitted a rebuttal pointing out the numerous fallacies in his PIP and written warning. In his June 2, 2019 letter to Director of Workplace Relations Investigator, Kate E. Sisson, Mr. Pierce informed her that Mr. Soodavar had provided no evidence in support of the allegations he made. Outlining the history of discrimination, he faced with Mr. Soodavar, Plaintiff identified multiple situations wherein Mr. Soodavar acted unprofessionally towards Plaintiff. Furthermore, Plaintiff pointed out the existence of differing standards for different employees. In the days following, Mr. Arney and Mr. Pisut urged Plaintiff to sign his

PIP, but Plaintiff informed them that he could not in good faith sign his PIP due to the falsities contained therein. However, his refusal to do so did not prevent him from being forced to participate in a PIP session with Mr. Soodavar and Ms. Arney.

31.     On May 23, 2019, Plaintiff requested a one-on-one conversation with Ms. Arney to file a harassment complaint against Mr. Soodavar immediately following the first PIP session. Plaintiff explained that he was the target of retaliation and sought to file a complaint. Ms. Arney stated that she did not believe that Mr. Soodavar's actions were retaliatory. Further, Ms. Arney stated that Mr. Pierce had already filed a harassment claim against Mr. Soodavar. Mr. Pierce then asked Ms. Arney if she knew the status of that claim as he had not been contacted by anyone concerning his claims. Ms. Arney then alleged that she did not know the status of his previous claim as it was outside of her department. However, when Mr. Pierce inquired as to who he could speak with for a status update, Ms. Arney alleged that she did not know such information.

32.     Also, during this conversation, Ms. Arney disclosed that Mr. Soodavar was "accidentally" copied on Mr. Pierce's initial emailed answers to HR and work relations' "sensitive" questions regarding the March 7, 2019 events. It was from this revelation that Mr. Pierce began connecting all the events following his complaints. Mr. Pierce realized that this might not have been the only time that Mr. Soodavar was "accidentally" informed of Mr. Pierce's confidential and sensitive information. Frustrated by the lack of confidentiality and integrity regarding the subsequent alleged investigation, Mr. Pierce informed Ms. Arney that the investigation was inequitable from the start.   Moreover, Mr. Pierce told Ms. Arney of the retaliatory actions Mr. Soodavar took following his receipt of Mr. Pierce's confidential interviews with HR. Later that day, Mr. Pierce would receive an email from a Leidos Investigations Coordinator, Jenny Johnson, stating that due to the actions of Mr. Soodavar, the case would be

reviewed by an independent and objective subject matter expert. Despite these assurances, the retaliation against Mr. Pierce intensified.

33.     In the days prior to his preapproved June 21, 2019 PTO, Mr. Pierce experienced a death in his family. As such, Mr. Pierce was required to travel back to the United States for bereavement lasting only three days. Considering the proximity of his bereavement leave with his preapproved June 21, 2019 PTO, Mr. Pierce requested that he be permitted to use a few more days of PTO to avoid coming back to the Middle East and leaving days later. Despite this reasonable request, Mr. Soodavar staunchly objected, clearly intending to make Mr. Pierce's situation more difficult.

34.     At this point, the stress from months of steady turmoil with Mr. Soodavar had begun catching up to Mr. Pierce. Upon receiving news of the newly denied PTO and multiple emails in false support of his PIP, Mr. Pierce began experiencing chest pains and shortness of breath. Paramedics were called to the scene, and Mr. Pierce was rushed to the hospital with blood pressure of 194/135. Fellow colleague, Nicholas Kozoroz, spoke with the paramedics and the ER physician about Mr. Pierce's health, and even relayed this information to other Leidos team members when he returned to work. Despite Mr. Pierce's ER physician note excusing his absence for the next three days, Mr. Soodavar took this as another opportunity to retaliate against Mr. Pierce. Upon Mr. Pierce's return to the office the same day of his hospital release, Mr. Soodavar sent several emails falsely accusing Mr. Pierce of poor performance, such as with the red packet submissions which Mr. Soodavar would later reference in the PIP, and even copying Mr. Pisut and Ms. Arney to the messages. Mr. Pierce instead focused on his newly denied PTO, requesting to telework from home between bereavement leave and approval leave. This request was approved.

35.     Just one week after his request to telework, Mr. Pierce was once again targeted by Mr. Soodavar with false allegations. In addition to his openly false accusations against Mr. Pierce, Mr. Soodavar also sabotaged Mr. Pierce at any given opportunity. Upon his return to work following his hospital visit, Mr. Pierce was bombarded with multiple contrived issues – all of which Mr. Soodavar also used in support of the fabricated PIP. Mr. Soodavar's continued discriminatory and retaliatory behavior against Mr. Pierce had taken its toll. After repeated accusations, Mr. Pierce's physical health began reflecting his toxic work environment. As such, Mr. Pierce took sick leave, during which, his physician confirmed that Mr. Pierce was suffering from high blood pressure, anxiety, panic attacks, and depression due to work stress. Mr. Pierce was even recommended a therapist to assist him in overcoming his psychological issues stemming from work stress.

36.     Avoiding work stress proved difficult as just six days after going on leave, Plaintiff was contacted by Ms. Arney regarding other positions at Leidos, which further worried Plaintiff. Leidos was determined to remove Plaintiff from his position as CENTCOM Team Lead. Mr. Pierce notified Ms. Arney about Mr. Soodavar's accusations that Mr. Pierce could not account for time worked that reflected his hours on his timecard. Mr. Pierce had been working on this program for many years and had never seen an incident where an employee was targeted for teleworking from home. Once again, Mr. Pierce had to provide evidence he was working where other white employees did not when teleworking. Mr. Pierce reported this to Ms. Arney who stated they ask their managers to carefully review timecards and hours worked.  This had not been the process used before with other white employees and Mr. Pierce did not understand yet again why he was being targeted.

37.     Following his initial diagnoses regarding his high blood pressure and additional stress induced ailments, Mr. Pierce officially started FMLA leave on June 28, 2019. Beginning on the first day of his FMLA leave, Mr. Pierce was constantly contacted by Ms. Arney asking about his options upon returning to work. Ms. Arney's communications were not limited to Mr. Pierce's future with the company, she also requested updates on preexisting shipments, the return of Mr. Pierce's Dept of the Army Common Access Card (CAC), returning the company laptop, and various other hardware used by Mr. Pierce throughout his employment.

38.     By July 8, 2019, Mr. Pierce personally informed Mr. Soodavar that he would not be returning to work the following day due to medical reasons. Following this notice to Mr. Soodavar, Mr. Pierce was yet again contacted by Ms. Arney regarding the return of his CAC card and his laptop and accessories. Given the subject matter of Ms. Arney's emails, Mr. Pierce's understanding was that his retaliatory termination from the company was eminent. Mr. Pierce began receiving confirmation from other employees regarding Mr. Soodavar's blatant favoritism towards white employees. For example, on July 28, 2019, Mr. Pierce was contacted by a Leidos employee who stated that while Mr. Pierce's timecards had been called into question, another white employee was unaccounted for nearly a week in July 2019; however, this employee's timecard was approved.

39.     On August 29, 2019, Mr. Pierce was also contacted by another Leidos employee who informed Mr. Pierce that during a teleconference, with the employee, Mr. Soodavar, and Senior Field Service Engineer (FSE), Carl Crowell (white male), Mr. Soodavar was clearly building a case against Mr. Pierce. During this teleconference, Mr. Soodavar attempted to get statements from the employee and Mr. Crowell against Mr. Pierce; however, both refused. During this meeting, the employee and Mr. Crowell's refusal to make false statements regarding Mr.

Pierce's performance resulting in a verbal altercation between Mr. Soodavar and Mr. Crowell. As Mr. Crowell's temper reached its peak, Mr. Crowell even used derogatory language against Mr. Soodavar. Notwithstanding, Mr. Soodavar did not appear angered and failed to take any disciplinary action against Mr. Crowell. Moreover, Mr. Soodavar never mentioned the confrontation again.

40.     Furthermore, Plaintiff was informed by employees that after he left on medical leave, Mr. Soodavar dramatically relaxed his standards, stopped enforcing the FSE SOP, and eliminated the frivolous actions which were common while Plaintiff was present. This confirmed Plaintiff's theories that the treatment he faced was discriminatory and retaliatory.

41.     On August 9, 2019, Mr. Pierce also filed a discrimination complaint with Jennifer Davis and the Leidos discrimination hotline outlining the disparate treatment he experienced. On September 17, 2019, in a clear effort to avail itself of any liability, Director of Investigations, Marcus Wu, sent an email to Mr. Pierce stating that Mr. Wu was instructed to inquire about Mr. Pierce's past discrimination complaints. Considering Plaintiff was on FMLA leave and the complaints occurred well before his leave, Plaintiff found it strange that Leidos was making a late, false attempt at resolving the matter. Especially since it was only after Leidos received a Letter of Representation from Plaintiff's legal counsel. Notwithstanding the impropriety of Leidos contacting an employee who was represented by counsel on the matter, Leidos made a clear effort to sabotage Mr. Pierce's claims while he was out on medical on leave.

42.     Ever since Plaintiff went on his medical leave, Defendant began a narrative regarding alleged missing assets and the return of a Common Access Card (CAC). Initially, Defendant claimed that the assets would be reissued to Plaintiff once he returned from his leave. Defendant proceeded to send a list of 50 items that were not yet received. From the list, plaintiff

returned the items that were in his possession immediately. Upon further effort, he managed to return items in his apartment in Kuwait through a co-worker. The remaining assets on the list were not in Plaintiff's possession and Plaintiff no longer had access to them.

43.     Plaintiff made it very clear that upon his departure from Kuwait, the rest of the items were left in a warehouse in the Middle East. Plaintiff gave the exact location of the warehouse and clarified that every individual working on the program with Plaintiff had access to these remaining assets. Plaintiff also mentioned to Defendant that many employees in the past were unable to account for missing assets and no action was ever taken nor was there any penalty charged on the employee. Defendant would normally just provide a list of unaccounted assets to the customer and the items would then be removed from property management. In fact, Plaintiff witnessed these incidents multiple times throughout his employment.

44.     In May of 2020, Plaintiff was authorized to return to work by his doctor. When Plaintiff inquired about returning to work, Defendant emphasized that a pre-condition to discussions regarding Plaintiff's return to work was the return of the missing assets. Since Plaintiff had already made every effort to return what he could and explained this to Defendant multiple times, Plaintiff then realized that the missing assets were just being used as a pretext to essentially keep Plaintiff from returning to work. At this juncture, Defendant also claimed that the RF-ITV III program that Plaintiff was working on was coming to an end in a few months and therefore, since Defendant would no longer be the prime contractor on that effort, Plaintiff's position no longer remained. Based on that reasoning, Defendant could have easily placed Plaintiff on an alternative program, as was the usual protocol.

45.     However, Defendant purposefully held Plaintiff back from continuing his employment. Instead, defendant offered Plaintiff two options, either Plaintiff could choose to be

permanently laid off, or alternatively, Plaintiff could accept termination from his current position and apply for other positions within Leidos. Both options involved Plaintiff being unable to return to work. However, the latter option came with two conditions. First, there was no actual guarantee that he would be selected for a position that he applied for, and second, he would be required to complete the Performance Improvement Plan (PIP) which was a falsified document to begin with, if offered a new position. Therefore, Leidos made sure to leave Plaintiff with absolutely no viable options.

46.     Plaintiff soon found out that Defendant's alleged statement about the RF-ITV III program ending soon was a blatant lie since this was not the case. In fact, this program is currently still ongoing and will continue until March of 2021. Plaintiff attempted to be forthright with Defendant and requested Defendant to verify whether denying Plaintiff the opportunity to return to work meant that Plaintiff was actually terminated. Defendant insisted that Plaintiff had not been terminated but simultaneously prevented him from returning to his job. It was increasingly clear that Defendant was using different avenues to essentially keep Plaintiff from returning to work. First, Defendant delayed the matter with the discussion of missing assets, then Defendant utilized an excuse of the program's termination.

47.     Lastly, Defendant claimed that Plaintiff's previous position had been filled and he had been replaced by someone else. This was a complete contradiction to Defendant's earlier statement referencing the end of the program. Again, Defendant offered the two options once again. However, Plaintiff understood this to mean that all the above reasons were pretextual and he was not allowed to return to work and therefore, he had been officially terminated.

48.     In September 2020, Plaintiff was told by an old coworker, Aisha Grissam, that the company was looking to fill positions within the same program that Plaintiff worked. When a

member of the program inquired about Plaintiff returning to the program since he had been authorized by his doctor, Mr. Soodavar replied that he would not allow Plaintiff to return on this program, although he could apply elsewhere.

49.    Plaintiff has not yet received his end of the year gratuity of eleven thousand dollars ($11,000) for the 2019 work year. Whereas, David Woronoff, a white counterpart, who left the program in July of 2020, received his in November of 2019.

## V.    CAUSES OF ACTION

## COUNT NO. 1 - RACIAL DISCRIMINATION UNDER TITLE VII AND SECTION 1981

50.    Title VII of the Civil Rights Act of 1964 and Section 1981 make it unlawful for an employer to "fail or refuse to hire or to discharge an individual, or otherwise discriminate against any individual because of that individual's race". *See* 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981.

51.    Pursuant to 42 U.S.C. § 2000e-2 and to 42 U.S.C. § 1981, Plaintiff pleads a cause of action against the Defendant for racial discrimination.

52.    The allegations contained in all paragraphs of this complaint are hereby incorporated by reference with the same force and effect as if set forth verbatim.

53.    Defendant engaged in discrimination against Plaintiff, an African American employee, by harassing him, unfairly disciplining him, undermining his authority and eventually terminating him on the basis of his race.

54.    Plaintiff was subjected to racially derogatory treatment and treated differently than other similarly situated Caucasian employees in terms of policy application, discipline, and career advancement opportunities.

55.     Plaintiff was denied job promotions for allegedly being "unqualified" while Caucasian employees far less qualified and experienced than him were offered the same promotions.

56.     Individuals who engaged in similar or identical behaviors as Plaintiff were not disciplined and were outside of Plaintiff's protected class. Plaintiff was disciplined and used as a scapegoat for matters out of his control.

57.     Plaintiff was placed on a maliciously contrived PIP and final written warning containing erroneous information regarding Plaintiff's past performance, false accusations of underperformance when other evaluations proved otherwise and accusations of being "aggressive" and "disrespectful", stereotypical tropes often assigned to Black men.

58.     The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee.

59.     Plaintiff alleges that the Defendant harassed, unfairly disciplined, wrongfully terminated and otherwise discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C § 1981.

## COUNT NO. 2 – RETALIATION UNDER TITLE VII AND SECTION 1981

60.     Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 makes it unlawful for an employer to discriminate against an employee because the employee has "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participate in any manner in an investigation, proceeding, or hearing under this subchapter." *See* 42 U.S.C. § 2000e-3 and 42 U.S.C. § 1981.

61.     Pursuant to 42 U.S.C. § 2000e-3 and 42 U.S.C. § 1981, Plaintiff pleads a cause of action against the Defendant for retaliation.

62.     The allegations contained in all paragraphs of this complaint are hereby incorporated by reference with the same force and effect as if set forth verbatim.

63.     After Plaintiff's complaints of the racially derogatory actions and comments made by Mr. Soodavar, Plaintiff was subjected to increased scrutiny and harassment by Mr. Soodavar.

64.     In retaliation for his protected complaint, Plaintiff had false allegations made against him by supervisors in order to make him look incapable of leadership and essentially lose his job.

65.     In retaliation for his protected complaint, Mr. Soodavar undermined Plaintiff's authority as a team lead by dismissing the orders given by Plaintiff to his subordinates.

66.     In retaliation for his protected complaints including his EEOC charge, Defendant conspired against Plaintiff to terminate Plaintiff by using missing assets to delay his return, claiming the program Plaintiff worked on was ending soon, hiring another individual to replace plaintiff while he was on leave, and offering him a choice of applying elsewhere in the company subject to the falsified PIP agreement and no guarantee of a job or otherwise unemployment via a lay off, and ultimately terminating his employment based on pretext.

## VI.     DAMAGES

67.     Plaintiff sustained damages as a result of the actions and/or omissions of Defendant described herein. Accordingly, Plaintiff is entitled to an award of actual and compensatory damages, including lost wages and benefits in the past and future, in an amount within the jurisdictional limits of the Court. Plaintiff also seeks an award of damages for his mental anguish and pain and suffering he has suffered, continues to suffer, and will suffer in the future.

68.     Additionally, as a result of Defendant's above-referenced actions and/or omissions, Plaintiff was required to retain counsel to protect and enforce his legal rights. Accordingly,

Plaintiff also seeks compensation for his attorneys' fees, pre-judgment and post judgment interest, out-of-pocket expenses, expert fees and costs of Court he will have incurred in this action.

## VII.   PUNITIVE DAMAGES

69.    Plaintiff would further show that the acts and omissions of Defendant complained of herein were committed with malice or reckless indifference to his protected rights. In order to punish said Defendant for engaging in unlawful business practices and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant for punitive damages.

## VIII.   JURY DEMAND

70.    Plaintiff respectfully requests a trial by jury on all issues to be tried in this matter.

## IX.    PRAYER

 For the reasons set forth above, Plaintiff Marvin Pierce respectfully prays that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for:

a.   All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or an amendment thereto, including but not limited to actual and compensatory damages, including lost wages and benefits in the past and future in an amount within the jurisdictional limits of the Court.

b.   Mental anguish and pain and suffering that he continues to suffer and will suffer.

c.   Reasonable attorney's fees as allowed by law, with conditional awards in the event of appeal;

d.   Prejudgment interest at the highest rate permitted by law; Post-judgment interest from the judgment until paid at the highest rate permitted by law;

e.   Punitive damages in an amount above the minimum jurisdictional limits of the Court;

f.   Out of pocket expenses, expert fees, Costs of Court; and

g.   Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by proper amendment thereto.

Respectfully submitted,

TB Robinson Law Group, PLLC

Terrence B. Robinson, Attorney in Charge
SD Bar No. 14218
Texas Bar No. 17112900
Email: TRobinson@TBRobinsonlaw.com
Dania Masood
Fed. Bar No. 3574453
Texas Bar No. 24118459
Email: DMasood@TBRobinsonlaw.com
7500 San Felipe St., Suite 800
Houston, Texas 77063
Phone: (713) 568-1723
Facsimile: (713) 965-4288
**ATTORNEYS FOR PLAINTIFF**