United States District Court
Southern District of Texas

**ENTERED**

December 27, 2021

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARVIN PIERCE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-20-CV-3339 |
| | § | |
| LEIDOS, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION GRANTING MOTION FOR
SUMMARY JUDGMENT**

Marvin Pierce sued his employer, Leidos, Inc., alleging racial discrimination and harassment, and retaliation for complaining, in violation of Title VII and 28 U.S.C. § 1981. Pierce worked for Leidos or its predecessor, Lockheed Martin, starting in 2011. From 2017 to July 2019, he worked as a Field Service Engineer Team Lead, assigned to work in Kuwait under a contract between the government and Leidos. Pierce went on medical leave in July 2019, and he was still on leave when the Leidos government contract under which Pierce worked ended in April 2021. Leidos's employees had to interview for a new position under the successor contract. Pierce did not do so. The parties dispute whether Pierce was terminated.

This court previously dismissed Pierce's claims that arose from the events he alleged occurred before January 16, 2019, 300 days before Pierce filed his EEOC charge, as untimely under Title VII. The court also dismissed Pierce's claims that arose from failures to promote him before 2018, 300 days before Pierce filed this lawsuit, as untimely under § 1981. Leidos has moved for summary judgment on the remaining race discrimination, harassment, and retaliation claims, and Pierce has responded. (Docket Entry Nos. 34, 35, 36). Based on the motion and reply,

the record evidence, and the governing law, this court grants the motion for summary judgment and enters final judgment.  The reasons are stated below.

## I.    Background

Pierce, who is African American, started working for Leidos—then Lockheed Martin—in 2011.  (Docket Entry No. 35-12, at 2).  Beginning in 2017, he worked in Kuwait as a "field service engineer/team lead" under the supervision of Charles Soodavar, a regional manager, and Scott Pisut, a program manager.  (Docket Entry No. 34-1, at 10, 15).  Soodavar had been Pierce's direct supervisor since 2015.  (Docket Entry No. 35, at 7).  Pierce's job responsibilities under the contract between Leidos and the Department of Defense included performance site surveys and site maintenance visits, dealing with technology and communications issues, and securing and accounting for government furnished equipment.  (Docket Entry No. 34-1, at 9–11).

The parties dispute who—Pierce or Soodavar—started the unpleasant verbal exchanges between them in 2019.  (Docket Entry No. 34-1, at 168–69 (noting incidents starting in January 2019)).  Pierce does not dispute that in December 2018, he received a performance review from Soodavar for the year that rated his performance at 3 out of 5 and criticized aspects of his work.  (Docket Entry No. 34-1, at 155).  Leidos also presents evidence that in February 2019, Pierce had conversations about internal business matters with Leidos customers, who in turn expressed concerns about these conversations to Soodavar, who in turn relayed them to Pisut.  (Docket Entry No. 34, at 4; Docket Entry No. 34-1, at 113–17, 147–48).  Pierce does not dispute that the customer interactions occurred, but he does dispute that they were "improper."  (Docket Entry No. 35, at 10; Docket Entry No. 35-12, at 3).

In March 2019, Soodavar and Pierce had a scheduled telephone call about the 2018 performance review.  The parties agree the exchange became unpleasant, but offer different

versions of the conversation.  (Docket Entry No. 34-1, at 24; Docket Entry No. 34-1, at 149).
Leidos contends, and offers summary judgment evidence that, Pierce protested his performance
review, swore at Soodavor, and accused Soodavar of ruining his career.  (Docket Entry No. 34-1,
at 164 ("Marvin was not at all happy about my feedback.  His comments to me were extremely
disrespectful, unprofessional and insubordinate.  In addition, from my seat, I view some of his
comments as potentially slanderous.  Marvin made it very clear that he hated his job, hated working
for me and felt I had ruined his career. . . .   He went on to criticize my management style, my
knowledge, questioned my integrity and went on to say many more hurtful and completely
fabricated innuendos."); *see also* Docket Entry No. 34-1, at 149 ("To be quite honest, I have never
been more disrespected as Marvin was towards me on our performance phone call.  His comments
were so unbelievably disrespectful and out of line."); Docket Entry No. 34-1, at 166 ("I thought a
lot about my performance review call with Marvin last week and I continue to not be happy
thinking of all the untruthful and hurtful comments he made.  In addition to what I described below,
Marvin came across as belligerent and his comments were downright verbally abusive.")).

Pierce contends, and in his declaration states, that he "completely contradicted" the review
during the telephone call, but Pierce insists that it was Soodavor who "ridiculed and harassed"
Pierce and who used profanity.  (Docket Entry No. 35-12, at 2; Docket Entry No. 34-1, at 24).
Pierce states that Soodavor falsely accused Pierce of having "reoccuring performance issues" and
of being "nonexistent in performing his duties throughout 2018."  (Docket Entry No. 35-12, at 3).
Pierce states that Soodavor was "bating [sic] Plaintiff by swearing, yelling, and admonishing him
for 'not responding to anything.'"  (*Id.*).  Regardless of the conversation between Pierce and
Soodavar, Pierce received a salary *increase* after the performance review.  (Docket Entry No. 34-
1, at 124).

The parties agree that the conversation ended with Soodavor stating that he would discuss the phone call with Pisut and with Leidos's Human Resources department.  (Docket Entry No. 34, at 5; Docket Entry No. 35, at 9; Docket Entry No. 34-1, at 122).  When the Human Resources representative, Julie Arney, called Pierce, he accused Soodavor of calling Arney as a preemptive strike.  Pierce complained about the performance review, and he gave his own "account" of the customer interactions that had occurred in February 2019, not denying the interactions but accusing Soodavor of fabricating them as improper.  Pierce emphasized that he thought Soodavar was not a good leader and that he had more experience than Soodavar.  (Docket Entry No. 34-1, at 171–72).  In his summary judgment response, Pierce emphasizes the positive performance reviews he received before 2018 (including 2015, 2016, and 2017, all under Soodavar's direct supervision), (*see, e.g.*, Docket Entry No. 35-10), and Pierce describes himself as having such "extraordinary capabilities and extensive experience" that Leidos relied heavily on him, and, indeed, relied solely on him to "re-establish the ITV ['In-Transit Viability'] footprint throughout the Iraq Area of Operations…."  (Docket Entry No. 35-12, at 2).  Leidos presents evidence that during his March 2017 conversation with Arney, after the exchange with Soodavor, Pierce did not complain of racial discrimination or harassment.  (Docket Entry No. 34-1, at 171–72 (detailing "notes from [Arney's] call with [Pierce] on 3/26")); *see also* Docket Entry No. 34-1, at 28–29 (Pierce Deposition) (Q: "[B]efore this August 9th, 2019, email, had you said that people are treated differently and say that it was because of race or color?"  A: "Not to the—to the extent of race and color.")).  Pierce asserts that the subjects of his call with Arney included "discriminatory treatment" from Soodavar, but no details are provided.  (Docket Entry No. 35, at 9).

Leidos assigned Angela Marquez, a Leidos senior Workplace Relations manager, to investigate the customer interactions and the phone call between Soodavor and Pierce.  (Docket

Entry No. 34-1, at 215 (noting that "a Leidos Workplace Relations case was opened on 17 April 2019 to investigate [Pierce's] behavior as it pertains to the Leidos code of conduct, and . . . was closed on 9 May 2019")). She concluded that the contents of the customer conversations could not be validated, although they did take place. (Docket Entry No. 34-1, at 195 ("[I]nvestigation was able to validate there were conversations that took place between [Pierce] and the customer on said dates, but [Pierce] provided a different version of the conversations. Without being able to speak directly with the customer, the investigator was not able to validate the customer allegations with certainty.")). She also concluded that Pierce's behavior and communications during the March 2019 conversation were inappropriate. (*Id.* ("Investigation validated inappropriate behavior and communications by [Pierce] during the performance review discussion per [Pierce's] own admission.")).

A Corrective Action Review Committee was convened, consistent with Leidos's performance and disciplinary procedures. The Committee issued Pierce a Final Written Warning and a Performance Improvement Plan. (*Id.* at 185, 207; *see also id.* at 210 ("The purpose of this memorandum is to address issues regarding your continued inappropriate outbursts, insubordination and unprofessional behavior.")). "A Final Written Warning (FWW) does not mean that [the employee has] received other written notice on that particular issue. It means that if there is another occurrence of the offense that is described in the [written warning], that would be [his] final warning, and further disciplinary action would likely occur." (Docket Entry No. 35-21).

In May 2019, Pierce was told of the actions, but refused to sign the documents. (Docket Entry No. 34-1, at 197, 205; *see also id.* at 218 (warning Pierce that even if he did not sign, "the PIP and written warning are still in effect")). Pierce states in his summary judgment response that

he "signed the documents and was subjected to weekly PIP meetings thereafter," but he cites to no record evidence suggesting that he signed the documents or attended weekly meetings to discuss performance objectives in the Plan.  (Docket Entry No. 35, at 13).  There was no salary reduction, no change in title, no change in pay, and no change in work assignment.  (Docket Entry No. 34, at 8; Docket Entry No. 34-1, at 25–26).

In June 2019, Pierce returned to Texas for family reasons, taking bereavement leave.  When that expired, he took a few days of vacation time, although he claims Soodavar objected to the extended leave.  Indeed, Soodavar replied to Pierce's request:

> As you are aware, I approved your original vacation dates, but didn't see a request for the extra 6 days, where you are combining bereavement leave and your vacation. As much as I would like to support these extra 6 days, I have a hard time approving them because I didn't see the 6 extra days requested and we have many open actions (especially with assets and missions) that we need to complete in support of our program.  In addition, you are currently on a 60 day PIP that will need to be discussed and potentially adjusted, based on the time you will be on leave.

(Docket Entry No. 34-1, at 221 (email from Soodavar to Pierce)).  Despite Soodavar's hesitancy, Pierce asked to telework and was given permission to do so.  (Docket Entry No. 34-1, at 224–25; Docket Entry No. 35-13, at 3).

While in Texas, Pierce began experiencing shortness of breath and chest pains.  (Docket Entry No. 34-1, at 227).  Pierce contends that he suffered these symptoms because of stress caused by Soodavar.  He alleges that Soodavar continued to criticize him during the weekly meetings on performance—although he again presents no record evidence that these weekly meetings occurred—and that as a result of this "continued discriminatory and retaliatory behavior," Pierce suffered high blood pressure, anxiety, panic attacks, and depression.  (Docket Entry No. 35, at 13). Pierce has been on a medical leave of absence since July 2019.

6

After Pierce went on medical leave, Leidos sought to account for the government furnished equipment that Pierce had been responsible for during his employment as a field service engineer team leader.  (Docket Entry No. 34-1, at 237, 270–71, 282).  The evidence is that Leidos had to locate the equipment and transfer responsibility for it to another field service engineer, and report this to the government in routine monthly audits.  The evidence is that Leidos did not timely or sufficiently account for the over 388 pieces of equipment that were assigned to him.  "[O]ver a hundred" pieces of equipment "were not . . . where Mr. Pierce had said they were in the database." (Docket Entry No. 34-1, at 241; *see also id.* at 242 ("And I will point out that of the 388, you know, minus the 49 that are not able to be located, that not all of them were where Mr. Pierce said they should be.  We found them in different countries.  We found them in different places. . . .  Mr. Pierce's asset database records were not up to date.")).  Leidos was able to "locate all but 49."  (*Id.* at 242).

Pierce offers a different version, accusing Leidos of having the ability to easily change the record to label Pierce as the responsible individual for equipment he did not have access to, in order to hold him accountable for that equipment and use his difficulty in accounting for it as a "pretext to refuse his return to work." (Docket Entry No. 35, at 15).  Pisut testified, however, that "the assets were already in [Pierce's] name," that Leidos "ran a report based on the responsible individual," "pulled the record," and "ask[ed] other [individuals] in Kuwait to locate those assets that were already in Mr. Pierce's name."  (Docket Entry No. 34-1, at 264).

Pierce argues as well that he did not have information about assets not in his physical possession in the United States, and that he could only point to the Kuwait warehouse where he thought they were located.  (Docket Entry No. 35, at 15).  He argues that he did what he could to help Leidos locate the equipment.  Leidos ultimately accounted for all but 49 pieces of equipment,

7

but ended up paying the government approximately $19,400 for the missing pieces.  (Docket Entry No. 34-1, at 257).  Leidos was unable to provide an explanation for the missing equipment to the government because "Mr. Pierce didn't give [Leidos] an explanation.  [Leidos's] legal team asked many, many times to try to get help from Mr. Pierce to try to find the missing assets, and . . . didn't get any data that would lend . . . any help to find them."  (Docket Entry No. 34-1, at 255; *see also id.* at 257).

In May 2020, Pierce was cleared to return to work.  (Docket Entry No. 35-12, at 5).  He argues that he was forbidden to return to work until he returned the missing assets, which he asserts was a ploy to keep him from returning to work.  (*Id.* (stating that "a pre-condition to discussions regarding [his] return to work was the return of the missing assets.")).  Leidos asserts, however, that "[u]nder the terms of the government contract with Leidos, so long as [Pierce] was on leave, the government would temporarily defer adjudication of the location of the assets."  (Docket Entry No. 34, at 16).  Leidos deferred Pierce's start date while trying to locate the 49 assets that remained missing, until the issue was resolved through Leidos's payment to government.

Pierce also asserts that Leidos simply charged off equipment that other field service engineers could not account for.  Soodavar testified, however, that only one other individual had ever lost as many assets as Pierce, and that there were ramifications for those lost assets.  (Docket Entry No. 35-14, at 21).  That individual "was placed under Performance Reviews," but "ended up resigning" as the company was "getting ready to place him on a [Performance Improvement Plan]."  (*Id.*).  The company "place[d] a note in his employee profile to say that he should never be hired again."  (*Id.* at 22).

In August 2019, while Pierce was on leave and after he had been issued the warning and Final Performance Improvement Plan, Pierce emailed the "Leidos Hotline" and complained that

"as an African American United States Army veteran," he "ha[d] been racially discriminated against on numerous occasions in regards to job promotions/advancement, code of conduct, corporate policy violations, and job performance on a program where there are no African American managers." (Docket Entry No. 34-1, at 275). Pierce alleges that there was no investigation of his allegations. (Docket Entry No. 35, at 14). Leidos presents evidence, however, that when "[i]nvestigators attempted to speak with Mr. Pierce" about his discrimination allegation, "he refused to be interviewed," and "his personal attorney . . . indicated that he was pursuing remedy through legal channels." (Docket Entry No. 34-1, at 279).

It is undisputed that the subcontract between Leidos and the government under which Pierce had worked terminated in April 2021, and Leidos became a subcontractor to a successor government contract. (Docket Entry No. 34-1, at 258). Pierce argues that Leidos used this change as a pretext to require him to reapply for a position under the successor contract, while other field service engineers were "rebadged to continue working under the new prime contractor and had no gap in employment." (Docket Entry No. 35, at 16). Pierce argues that this was further retaliation.

Leidos responds that there were three field service engineers, including Pierce, who did not make the transition to the new contract because they were on active leave of absence when the change occurred. (Docket Entry No. 34-1, at 260). All other employees had to "interview[] for the positions to make sure that the [new prime contractor] was comfortable with their skills and capabilities[,] [a]nd then they were made offers." (*Id.* at 261). Pierce has not interviewed for any new position. (*Id.*). Leidos maintains that Pierce remains on leave of absence; he has not been terminated, but he does not have a current position under a current contract. (Docket Entry No. 34, at 17; Docket Entry No. 36, at 5 ("Plaintiff was provided the opportunity to bid on any open job at Leidos, but refused (and refuses to this day). . . . If he were to bid on and obtain another

9

position, he may still be accountable for the [Performance Improvement Plan] that was suspended during his leave.")).  Pierce claims that, "as far as [he] know[s], [he was] terminated." (Docket Entry No. 34-1, at 7).

Pierce filed this lawsuit in 2020.  He alleged discrimination, harassment, and retaliation, beginning in 2017, primarily from the person who had been his supervisor since 2015, Soodavar. (Docket Entry No. 1).  The court dismissed several of his claims as time barred, but retained claims of instances of "push back" in 2015 and "increased combativeness" in 2017 from Soodavar, and "increased combativeness from . . . white counterparts" in 2017 and 2018, because they were neither specific nor discrete acts and could not be dismissed as barred by limitations. The court noted then that the remaining claims of discrimination, harassment, and retaliation might be subject to other challenges.  (Docket Entry No. 24).  After discovery, Leidos raised those challenges, moving for summary judgment on all claims.

Each claim is analyzed below.

## II.     The Legal Standards

### A.     Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P.56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations and citations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying

the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.,* 709 F. App'x 287, 288 (5th Cir. 2018) (per curiam) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters. Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.,* 864 F.3d 326, 335 (5th Cir. 2017) (per curiam). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Parish Prison*, 663 Fed. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted).

In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*,

572 U.S. 650, 651 (2014) (per curiam)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.   Title VII

#### 1.   Discrimination

Under Title VII, a plaintiff may show discrimination in response to a summary judgment motion using either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Direct evidence proves the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted), *overruled on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 330 (5th Cir. 2010). When, as here, the evidence is circumstantial, the court uses the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). The plaintiff alleging discrimination must make a *prima facie* showing that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and (4) others similarly situated but outside the protected class experienced more favorable treatment. *Id.*; *see also Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005).

The Fifth Circuit has applied the fourth element strictly, so that a plaintiff must show that his employer treated similarly situated employees more favorably in "nearly identical circumstances." *Reed v. Brady Trucking, Inc.*, No. CV H-18-4437, 2019 WL 1244100, at *11 (S.D. Tex. Mar. 18, 2019) (citation omitted) (emphasis omitted); *see also Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("To establish a claim of disparate treatment, [the

plaintiff] must show that [the employer] gave preferential treatment . . . under 'nearly identical' circumstances." (quoting *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir.1990) (per curiam))).

Once the plaintiff has addressed these four elements, the burden shifts to the defendant to explain how the adverse employment action was nondiscriminatory. If the defendant proffers a nondiscriminatory basis for the action, then the plaintiff must point to evidence raising a fact dispute as to whether (1) the explanation is a pretext for discrimination or (2) there are mixed motives—the employer's explanation, while true, is only one factor in the decision, and discrimination is another. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). The plaintiff must show a genuine factual dispute material to deciding whether the defendant discriminated on the basis of the plaintiff's membership in a protected class. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

"[The Fifth Circuit] precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling for Title VII discrimination claims[.]" *Mitchell v. Snow*, 326 F. App'x. 852, 855 (5th Cir. 2009) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007)). "[A]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Id.* at 854 (quoting *McCoy*, 492 F.3d at 559).

### 2.    Retaliation

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made [] unlawful . . . by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff must point to facts showing that: (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). The third element, causation, requires the plaintiff to point to evidence showing that the adverse employment action would not have occurred but for the protected conduct. *See Septimus*, 399 F.3d at 608.

Once the plaintiff makes this showing, the defendant has the burden of proffering a legitimate, nonretaliatory explanation for the adverse employment action. *See id.* at 609. If the defendant does so, the burden shifts back to the plaintiff to raise a factual dispute material to determining whether the articulated reason for the employment action was a pretext for retaliation. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

### 3.      Hostile Work Environment

To establish a hostile-work-environment claim under Title VII, a plaintiff must prove that:

(1) [he] belongs to a protected group; (2) [he] was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)); *Collier v. Dallas Cnty. Hosp. Dist.*, 827 F. App'x 373, 377 (5th Cir. 2020) (quoting *Hernandez*, 670 F.3d at 644). The harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and it cannot be "measured in isolation." *Ramsey*, 286 F.3d at 268 (citations omitted).

To determine whether a work environment is actionably hostile, "all of the circumstances must be taken into consideration," such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hernandez*, 670 F.3d at 651 (citation omitted). "[T]he work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). Moreover, "[t]he alleged conduct must be more than rude or offensive comments [or] teasing." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 326 (5th Cir. 2004). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citation omitted).

The Fifth Circuit has not recognized a separate cause of action for a retaliatory hostile-work-environment. *See Montgomery-Smith v. George*, 810 F. App'x 252, 258 (5th Cir. 2020). But other circuits have recognized the claim, and courts on the Fifth Circuit have assumed that the claim could be cognizable. *See id.*; *see also Zavala v. Carrollton-Farmers Branch Indep. Sch. Dist.*, No. 3:16-CV-1034-D, 2017 WL 274133, at *2 (N.D. Tex. Jan. 20, 2017); *Boudreau v. Nokia of Am. Corp.*, No. 3:19-CV-01623-E, 2020 WL 7426155, at *6 (N.D. Tex. Dec. 18, 2020) (collecting cases). District courts in this circuit follow a modified approach to addressing retaliatory hostile-work-environment claims, under which "the first element [requires] proof that the plaintiff had engaged in a protected activity, and the third element [requires] demonstration of a causal connection between the harassment and the protected activity." *Zavala*, 2017 WL 274133, at *3.

15

### III.    Analysis

### A.    The Title VII Discrimination Claim

Pierce alleges that Leidos, primarily through Soodavar, discriminated against him and subjected him to adverse treatment and a hostile work environment based on his race, and retaliated against him for complaining, in violation of Title VII.   Much of what Pierce presents as evidence of racial discrimination does not amount to an adverse employment action.   None of what he presents is sufficient to support an inference of racially disparate treatment or actionable harassment.

Pierce is African American and he is qualified for his position.   He has established the first and second prongs of the *prima facie* test.   Pierce asserts that he noticed a "lack of respect and an overall disregard for his title as Team Lead from white employees, including continuing undermining of his authority by Mr. Soodavar" by making himself the only supervisor who could discipline an employee.   (Docket Entry No. 35, at 7).   A white male subordinate also undermined Pierce's authority by reporting directly to Soodavar.   (*Id.*).   In 2018, Soodavar, the same supervisor who had favorably reviewed Pierce's work for three years, from 2015 to 2017, "intentionally [gave Pierce] a negative evaluation and reprimands."   (*Id.*).   Pierce does not allege any diminution in job title, duties, compensation, or other terms of employment as a result.   He got his expected 2018 bonus.   (Docket Entry No. 34-1, at 124).

Pierce does not identify summary judgment evidence showing that the evaluation reduced or otherwise affected his job duties, compensation, or benefits.   He received a job evaluation rating of 3 out of 5, and criticisms of aspects of his job performance.   (Docket Entry No. 34-1, at 155–58).   A negative performance review, with no accompanying negative impact on compensation or

job duties, is not an adverse employment action.   *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014); *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427, n.19 (5th Cir. 2017).

While Pierce disputes that he deserved anything but robust and profuse praise and thanks for his work, he does not point to evidence sufficient to show that the criticisms were adverse employment actions.   Nor does he point to anything but prior good reviews and his own subjective belief that his work was excellent, and that he would be better as the supervisor than Soodavar.   A subjective belief is not sufficient to show that a verbal reprimand for poor performance or a or poor review is actionable.   *See Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019).   In fact, there is evidence that Soodavar gave Pierce a higher performance review than was deserved.   Pisut wrote, in an email to Julie Arney, that "[i]n all honesty, Charles [Soodavar] could (and in hindsight probably should have) [] rated Marvin [Pierce] a 2 for the 2018 performance year, but he gave him the benefit of the doubt, and rated him a 3 with the hope that [Pierce] would take the constructive feedback and improve in the areas that [were] lacking."  (Docket Entry No. 34-1, at 160).

The evidence as to the March 2019 telephone exchange between Pierce and Soodavar is notable for the description of profanity, insults, and unprofessional statements by both participants. Soodavar asserts that Pierce accused him of ruining Pierce's career and used the word "fuck." Pierce asserts that Soodavar unjustly criticized Pierce's work and "bated" Pierce by generally swearing and yelling at him for "not responding" to Soodavar's criticisms.  (Docket Entry No. 35, at 8).  There is no evidence of any racial epithets by either side.  Nor is there evidence of racial terms at all in the parties' many discussions. There is evidence that the relationship between Soodavor and his subordinate employee, Pierce, deteriorated, clearly after the 2018 performance review was issued, but no evidence that it deteriorated because of racial animus.

The fact that Pierce was placed on a Performance Improvement Plan and a written warning is not sufficient to raise a factual dispute material to determining racially discriminatory treatment. The evidence shows that Pierce had customer communications in February 2019 that led to customer comments to Soodavar.  (Docket Entry No. 34-1, at 113–17, 147–48).  Leidos investigated these communications as well as the March 2019 phone call with Soodavar.  The investigation did not verify the content of the customer communications, because Pierce disputed them as improper.  (Docket Entry No. 34-1, at 195).  The investigation did substantiate Pierce's unprofessional and insubordinate behavior toward Soodavar in the telephone review of Pierce's 2018 performance evaluation.  *Id.*  Pierce has not identified record evidence that he was subjected to an arbitrary investigation, particularly given the fact that the investigation did not fault him for the customer communications.  Pierce's subjective view of the quality of his performance in 2018 does not raise a fact issue that Soodavar was motivated by racial bias in his criticism and evaluation. *Raina v. Veneman*, 152 F. App'x 348, 350 (5th Cir. 2005) ("An employee's subjective belief that he was discriminated against, standing alone, is not adequate evidence to survive a motion for summary judgment."); *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021).  Nor has Pierce identified record evidence that the Performance Improvement Plan or Final Warning were the result of racially disparate discipline or harassment, rather than of Leidos's disciplinary procedures for performance issues, unprofessional communications, or insubordination.  *See Lamb*, 914 F.3d at 946 ("A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." (quotation omitted)).

The fact that Leidos investigated and could not verify the contents of the customer conversations with Pierce undermines his argument that the investigation was unfair or in bad

faith.  The absence of conclusive evidence that Pierce violated Leidos's code of conduct by improperly discussing internal business affairs with customers is insufficient to prove improper discipline.   The central question in determining if discipline — including a Performance Improvement Plan or a Final Written Warning, and even termination — is proper is not whether the employee actually engaged in prohibited conduct, but whether the employer believed so in good faith.  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason.   We do not try in court the validity of good faith beliefs as to an employee's competence.") (quoting *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1995)).  The record evidence shows that Leidos had a reasonable basis for concern over Pierce's unprofessional communications with customers and with his supervisor.  (*See, e.g.*, Docket Entry No. 34-1, at 149, 164, 166, 195).  The voluminous summary judgment record reflects detailed documentation of the Performance Improvement Plan and the Written Final Warning.  It also reflects that if he completed the Performance Improvement Plan steps, he would suffer no work repercussions.  (Docket Entry No. 34-1, at 207–08).

Pierce's bereavement and subsequent extended personal leave and medical leave do not support his claim of unfavorable or disparate treatment.  The fact that Soodavar opposed the leave is not an adverse employment action or evidence of disparate treatment; Leidos granted Pierce's leave requests.  (Docket Entry No. 35-13, at 3).  Pierce was on leave until the contract under which Pierce had work terminated during his leave.  (Docket Entry No. 34-1, at 258; Docket Entry No. 36, at 5).  While Pierce asserts that other field service engineers employed under the same contract were permitted to transfer to the successor contract, (Docket Entry No. 35, at 16), Leidos presents undisputed evidence that field service engineers had to "interview for the [new] positions" when

the first contract terminated. (Docket Entry No. 34-1, at 261). Pierce did not apply for any other jobs since going on medical leave. (Docket Entry No. 34-1, at 30–31).

The evidence as to the efforts to find the equipment that Pierce was responsible for is not evidence of an adverse employment action or discrimination. Pierce alleges that Leidos falsely allocated the missing assets to him, (Docket Entry No. 35, at 25), but provides no evidence other than a statement by Pisut that it was "possible" that "assets that were in Mr. Pierce's name could have been moved into his name by the prior responsible individual" for those assets. (Docket Entry No. 35-5, at 6 (Q: "[I]t is possible, then, that the assets that were in Mr. Pierce's name could have been moved into his name by the prior responsible individual, correct? A: "If there was one. I suppose that's a possibility.")). Pierce does not present any evidence that the 388 pieces of equipment assigned to Pierce were in fact falsely assigned to him by prior responsible individuals, and he does not dispute that the records ascribed the 388 missing pieces to him. (Docket Entry No. 34-1, at 264).

Pierce does not dispute Leidos's evidence that if it did not account for the equipment during regular government audits, it would face financial and other penalties. Pierce denies that he should have or could have done more than he did, which was to relay his belief that the equipment was in a warehouse in Kuwait. (Docket Entry No. 35, at 15 ("[G]iven that he was still in the United States on medical leave, he could only point to where he believed the remaining assets were located in Kuwait.")). Pierce similarly does not dispute that after a prolonged search, Leidos located all but $19,400 worth of the equipment and that Leidos had to pay the government that amount. (Docket Entry No. 34-1, at 257). Pierce asserts that when other employees left and could not account for equipment, "the items were just 'written off.'" (Docket Entry No. 35, at 15 (quoting Docket Entry No. 35-14, at 22)). This is consistent with Leidos also having to pay the government for missing

equipment.  (Docket Entry No. 34-1, at 257 ("There's times when you miss an item, you lose an item, and the government just turns around and writes them off.  And then other times, they want all kinds of investigations done; they want the contracting office involved; they want everything else involved.")).  And there is no evidence that Pierce was disciplined or terminated because of the difficulty in locating the equipment he was responsible for when he began his leave.  The evidence in the record supports Leidos's assertion that it deferred Pierce's start date after he was ready to return from medical leave while they tried to locate the remaining 49 assets so that "the government would temporarily defer adjudication of the location of the assets," (Docket Entry No. 34, at 16; Docket Entry No. 34-1, at 264–66), and that Pierce's position ended when the subcontract between the government and Leidos ended in April 2021.  (Docket Entry No. 34-1, at 258).

The parties dispute whether Pierce's present status is as a terminated employee or an employee on active medical leave who has to reapply to be able to work under Leidos's successor contract with the government.  The court need not resolve this dispute to resolve this motion.  Even viewing Pierce's status as terminated, or viewing the requirement that he reapply to work under the successor contract as an adverse employment action, Leidos has submitted competent summary judgment evidence of its legitimate business reasons.  Leidos was concerned about Pierce's conduct, based on reports of his conversations with Leidos customers, followed by the telephone conversation with Soodavar.  Leidos's investigation verified that Pierce was unprofessional and insubordinate on the telephone conversation.  Soodavar had other concerns about Pierce's performance, although his three out of five rating qualified him for a raise.  Leidos had a code of conduct requiring employees "to maintain a respectful workplace."  (Docket Entry No. 34-1, at 14).  Finally, after Pierce began his leave, he could not promptly or completely account for the equipment he was responsible for.  Pierce has not met his burden of showing that placing him on

a Performance Improvement Plan, giving him a Final Written Warning, deferring his return to work until the equipment issues were resolved, and requiring him to reapply after the contract he was employed under expired during his active medical leave, were pretexts for, or motivated by, racial discrimination. *Jones*, 8 F.4th at 369 ("'Merely disputing' the employer's assessment of the plaintiff's work performance 'will not necessarily support an inference of pretext.'" (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999)).

The record does not show that similarly situated employees outside Pierce's protected class received more favorable treatment. *See Reed*, 2019 WL 1244100, at *11 (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001)). Although he offered the names of five, and perhaps six, comparators, none of these non-African-American Field Services Engineers was similarly situated. None was an "FSE Team Lead," and none had the same supervisor as Pierce. (Docket Entry No. 34, at 16, 22; Docket Entry No. 34-1, at 37–45). The conduct Pierce describes as to each of these other Field Service Engineers was either different from Pierce's conduct (such as issues with personal expenses or car accidents), or was based on exchanges with Soodavar that Pierce did not witness or hear. (Docket Entry No. 34, at 17; Docket Entry No. 34-1, at 37–45). And the evidence shows—from Pierce's own testimony—that two of the Field Service Engineers who Pierce identified as either argumentative with Soodavor or having improper customer conversations were "phased out" or reassigned. (Docket Entry No. 34-1, at 39, 45).

The record does not support an inference that Pierce was treated less favorably than similarly situated coworkers. Pierce has not raised a factual dispute material to his discrimination claim. Summary judgment is granted as to this claim.

B.      The Retaliation Claim

Pierce alleges that Leidos retaliated against him after he complained about racial discrimination by initiating reviews and discipline culminating in his extended leave and requirement to reapply for employment.   To survive summary judgment on this claim, Faucette must point to evidence showing that: (1) he engaged in a protected activity during the relevant time period; (2) he was subjected to an adverse employment action; and (3) there is a causal link "between the protected activity and the adverse employment action."  *Davis*, 383 F.3d at 319.

Pierce asserts that he raised "discriminatory treatment" by Soodavar in his conversation with Arney after the conversation about his 2018 performance review.   Leidos denies that Pierce did so in that conversation, but acknowledges that Pierce made a complaint of "race discrimination" in his August 9, 2019, email to the Leidos Ethics Hotline.  This is long after Pierce had been placed on a Performance Improvement Plan, given a Final Written Warning, and had received criticism over his inability to promptly and completely account for the assets he was responsible for.  Even if Pierce made a general reference to discrimination in his April 2017 conversation, it is clear that the bulk of his complaint was over Soodavar's overall deficiencies as a supervisor.  (Docket Entry No. 34-1, at 171–72).  A plaintiff alleging retaliation may satisfy the causal connection element by showing close timing between an employee's protected activity and an adverse action against him."  *Feist v. La, Dep't of Justice, Office of the Att'y. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (quotation and alteration omitted).   The temporal proximity must generally be "very close."  *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).   The more attenuated in time, the more other evidence of discrimination is required to show retaliation.  *See id.* at 454–55; *see also Lavergne v. Univ. of Texas Med. Branch*, No. H-19-1992, 2020 WL 5083465, at *7 (S.D. Tex. July 31, 2020) (courts consider "indicia of causation,"

such as an employee's disciplinary record, the employer's adherence to its own policies and procedures in carrying out the job termination, and the temporal proximity between the protected activity and the adverse employment action.).

The timing here is neither strongly probative of Pierce's claim or of Leidos's defense.  But there are ample grounds for finding events and facts that break the claimed causal chain between complaints of racial discrimination and the alleged retaliation.  The lowered performance review and Soodavar's decision to contact Human Resources about his conversation with Pierce preceded any alleged complaint of racial discrimination.  The Performance Improvement Plan and Final Written Warning came after Pierce's alleged—albeit generalized—mention of discrimination, as well as generally harsh treatment by Soodavar, in the telephone call with Arney that focused on Pierce's criticism of Soodavar's management skills.  But these disciplinary steps also followed the reports of the improper customer interactions and the unprofessional telephone conversation with Soodavar.  The Workplace Relations Investigation that Marquez conducted validated the unprofessional nature of Pierce's side of that conversation. (Docket Entry No. 34-1, at 195 ("Investigation validated inappropriate behavior and communications by [Pierce] during the performance review discussion per [Pierce's] own admission.")).

The record supports Leidos's compliance with its policies and procedures for investigations and implementing disciplinary steps.  (*See, e.g.*, Docket Entry No. 34-1, at 144, 185).  Leidos's arguments find sufficient support in the record to be persuasive.  Pierce has not pointed to evidence supporting a causal link between his protected activity and the employment challenged actions.  He primarily relies on conclusory allegations and statements he made in his own deposition and affidavit.  Leidos has pointed to documented, legitimate, nondiscriminatory reasons for the

disciplinary steps, the deferred return to work after medical leave, and the requirement that Pierce reapply for employment.   The court grants summary judgment on this claim.

### C.        The Hostile Work Environment Claim

Pierce does not explicitly raise a hostile work environment claim, but to the extent he asserts a retaliatory hostile work environment claim, there is no evidence of any discriminatory conduct or comments made by any Leidos employee toward Pierce.   The evidence at most shows that Pierce (as well as some other field service engineers who he tried to identify as comparators) found Soodavar a difficult supervisor.   (Docket Entry No. 34-1, at 37–45; Docket Entry No. 35-19, at 2–8).   The evidence shows that Pierce viewed Soodavar as an incompetent manager who did not sufficiently recognize Pierce's accomplishments and contributions, and that Soodavar perceived Pierce as disrespectful and insubordinate.   (*See e.g.*, Docket Entry No. 34-1, at 168). The allegations and evidence do not include racially charged statements.   The record evidence does show that Pierce was evaluated, criticized, and questioned, but all within the limits of the employment relationship.   Given the evidence, the court is not required to accept Pierce's conclusory statements about harassment at face value.   *Scott*, 550 U.S. at 380; *Jones*, 8 F.4th at 369.

Pierce has not shown a factual dispute material to resolving his retaliation claim.   Summary judgment is granted on this claim.

### IV.      Conclusion

Leidos's motion for summary judgment, (Docket Entry No. 23), is granted.   Final judgment is entered by separate order.   Each party is to bear its own costs.

SIGNED on December 27, 2021, at Houston, Texas

Lee H. Rosenthal
Chief United States District Judge

25